[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 22, 2006
THOMAS K. KAHN
CLERK

No. 05-14409

D. C. Docket No. 02-01851-CV-ODE-1

JACQUELINE SCOTT,

Plaintiff-Appellant,

versus

MARK F. TAYLOR,
in his official capacity as Lieutenant
Governor of Georgia, et al.,

Defendants,

THE DEKALB COUNTY BOARD OF ELECTIONS
AND VOTER REGISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(November 22, 2006)**

Before EDMONDSON, Chief Judge, BIRCH and ALARCON,[*] Circuit Judges.

PER CURIAM:

Jacqueline Scott appeals the district court's dismissal of her complaint challenging Act No. 401 of the 2002 Session of the Georgia General Assembly (hereinafter "Act No. 401") on the grounds that it violates equal protection. Act No. 401 adopted a new voting district map for the DeKalb County Board of Commissioners. Scott argues that the district court erred in dismissing the case for lack of standing. We affirm the district court's dismissal.

## I. BACKGROUND

Jacqueline Scott served on the DeKalb County Board of Commissioners (hereinafter "the Commission") from 1991 to 2002; she was the elected representative of district 3 from 1994 to 2002. In 2002, the Georgia General Assembly passed Act No. 401, which adopted a new voting district map for the Commission. A new map was needed to comport with the "one person, one vote" principle. Among other things, the district boundary lines in the reapportioned map shifted such that the precinct in which Scott resided was in district 5 rather

---

[*]Honorable Arthur J. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

than district 3. Scott thereby lost her status as the incumbent commissioner for district 3; and she was ineligible to run for office in district 3.[1]

Before the reapportionment, the Commission consisted of four white commissioners -- one of whom was Scott -- and three black commissioners. District 3 was 80 percent black. Scott contends she was moved from district 3 on account of her race, because it was likely she would be replaced by a black commissioner, thereby making a majority-black Commission possible.[2]

Before the 2002 election, Scott filed suit against the Georgia Lieutenant Governor, the Speaker of the House, and the chairs of the DeKalb County legislative delegations (altogether and hereinafter "the Legislator Defendants"). Scott also included as a defendant the DeKalb County Board of Elections and Voter Registration (hereinafter "the Board") "for the limited purpose of enjoining it from accepting and certifying candidates for the DeKalb County Commission elected pursuant to the voting districts established by [Act No. 401]." The Board had played no role in the development or passage of Act No. 401.

The Legislator Defendants moved for judgment on the pleadings, asserting legislative immunity. On interlocutory appeal, we reversed the district court's

---

[1]Scott must reside in district 3 to run for Commissioner of district 3. See O.C.G.A. § 45-2-1.

[2]In the 2002 election, district 3 did elect a black candidate to replace Scott.

3

decision on immunity and concluded that the Legislator Defendants were entitled to absolute legislative immunity. Scott v. Taylor, 405 F.3d 1251 (11th Cir. 2005). The district court then dismissed all claims against the Legislator Defendants, leaving the Board as the only remaining defendant.

Scott then filed an amended complaint in which she requested (1) an order declaring that the voting districts established by Act No. 401 are unconstitutional; (2) an injunction halting future Commission elections until the districts can be constitutionally reapportioned; (3) a court or legislative reapportionment of the County Commission districts; and (4) costs and attorney's fees. Scott seeks no damages. The district court dismissed Scott's amended complaint for lack of standing. The district court concluded there was "no causal nexus between [Scott's] Article III injury and the actions of the Board."

## II. STANDARD OF REVIEW

We review de novo an order dismissing a case for lack of standing. Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1351 (11th Cir. 2005).

## III. DISCUSSION

To show standing, Scott must first show that she "suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." <u>Lujan v. Defenders of Wildlife</u>, 112 S.Ct. 2130, 2136 (1992) (internal quotations and citations omitted). Then, Scott must show "a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." <u>Id.</u> Last, Scott must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Id.</u>

We assume that Scott has alleged a cognizable injury-in-fact. We agree with the district court's conclusion that Scott lacks standing: we do not think a favorable decision will likely redress Scott's injury.[3]

---

[3]Scott's argument that we are bound to find standing because of our decision in <u>Scott</u>, 405 F.3d 1251, lacks merit. In <u>Scott</u>, we -- on interlocutory appeal -- decided that the Legislator Defendants were entitled to absolute immunity in this case. In explaining the decision, our opinion included these words:

> Scott is free to maintain her suit against the Board of Elections. Indeed, the Board of Elections is the only defendant in this case which has any role with respect to the

Scott's injury concerns her ability to run for office in district 3. Because Scott now lives in district 5, she is currently unable to run for Commissioner of district 3 unless she moves to district 3. We will assume that Scott's being placed outside of district 3 -- on account of her race -- and being required to move to run in that district is a cognizable injury.[4]

Although a person may not have an unqualified constitutional right to run for office, one does have a "constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." Turner v. Fouche, 90 S.Ct. 532, 541 (1970). And the government may not deny a person "the privilege of holding public office that it extends to others" on account of her race. Id.; see also Anderson v. Martin, 84 S.Ct. 454, 456 (1964) ("Obviously, Louisiana may not bar Negro citizens from offering themselves as candidates for public office, nor can it encourage its citizens to vote for a candidate solely on account of race.").

---

relief sought by Scott, i.e., prospective relief seeking to enjoin the enforcement of the challenged voting district and a declaration as to its legality. . . . Should Scott prevail, she will still be able to obtain all of the relief she seeks.

Id. at 1256-57. But the issue of whether Scott had standing to sue the Board was not before us then; nor did we decide that Scott would have standing to sue the Board. To the extent we said the Board was the proper defendant, our words were dicta and not binding on future panels.

[4]The Board argues that Scott has not shown that she wants to run for office; thus, Scott has no injury-in-fact. We think Scott's amended complaint demonstrates a desire to run for office in the future. Thus, for the purposes of this appeal, we will assume Scott wants to run.

If we assume the truth of Scott's pleadings, Act No. 401 denies Scott the ability to run for office in district 3 on account of her race. Act No. 401 acts as a barrier that makes it harder for Scott to run for office in district 3 than the other incumbent commissioners who were not "drawn out" of their districts. Scott must move her residence to district 3 to run there, whereas other incumbents still reside in their districts and may run in those districts without the burden of moving. Scott's concrete injury is not just the loss of her incumbency,[5] but -- more specifically -- the inability to compete for the commission seat she formerly held on the same grounds as the other incumbent commissioners. We accept that Scott's injury-in-fact is her inability to run for office in district 3 without having to move to district 3.

Assuming arguendo that a court could provide equitable relief in this case, Scott's injury would still not likely be redressed by a favorable decision. For the sake of discussion, if a court declared the current district lines unconstitutional and

---

[5]Scott's loss of incumbency -- by itself -- is moot and not redressable. No court could grant Scott relief that would return her to incumbent status. See American Party of Texas v. White, 415 U.S. 767, 771 n.1 (1974) (noting that once an election is completed, a federal court may not grant retrospective relief that would affect the outcome).

7

ordered the General Assembly to redraw the lines in a completely racially-neutral manner, the relief would not likely remedy Scott's concrete injury.[6]

Another redistricting exercise -- one that is undoubtedly constitutional and blind to Scott's race -- would not necessarily place Scott back in district 3. The specific outcome of redistricting is speculative at best. If another redistricting placed Scott in district 5 again -- or any district other than district 3 -- she would be in exactly the same place as she is today. Scott would still have to move to district 3 to run for office in district 3. Thus, even if we ordered the legislature to redraw the district lines without regard to Scott's race, it is speculative whether Scott's concrete injury -- removal from district 3 -- would be redressed by such a remedy. Because Scott fails to establish that her personal injury would likely be redressed by a favorable decision, Scott lacks standing to sue the Board.[7]

---

[6]Scott argues that her injury is "the denial of equal treatment," which can be redressed by "simply removing race as a factor in the legislative redistricting process." Scott also says that, if the General Assembly redraws the voting lines without regard to Scott's race and the resulting map still places her residence in district 5, Scott's injury will be remedied and she will "have no disagreement with that redistricting process." Put differently, the relief Scott seeks may, in reality, leave the Plaintiff exactly where she was when she brought suit. For standing purposes, the injury -- which must be caused by the defendant's conduct and redressable by the court -- must be "concrete" and "particularized." We see Scott's concrete injuries to be two: Scott's loss of her incumbency and Scott's inability to run in district 3 without moving her residence. Scott's loss of incumbency is moot; so our inquiry has turned on whether her inability to run without moving meets the standing requirements.

[7] The Supreme Court has recognized -- as a legally cognizable injury -- "representational harm" suffered by voters in racial gerrymandering cases. See United States v. Hays, 115 S. Ct. 2431 (1995) (citing Shaw v. Reno, 113 S. Ct. 2816, 2827 (1993)). But we decline to extend these

8

## IV.  CONCLUSION

Scott does not have standing: her concrete personal injury is not likely to be redressed by a favorable decision.  Therefore, the district court's decision is,

AFFIRMED.

---

precedents to this case, which presents a materially different set of facts.  On DeKalb County's districts, Scott has alleged no malapportionment, vote dilution, or violation of the principle of one person, one vote.  Although Scott says she is bringing suit as an "elector, constituent and former Commissioner" and that Act No. 401 has affected the right of all District 3 voters to elect her, the basis of her particular claim is the harm she suffered as an incumbent candidate.  Thus, we decline to classify Scott's injury as the same kind of representational harm that exists when the government generally uses race to infringe on voters' rights.